Thank you your honor. I'd like to use my time this morning initially to walk you through what we believe are five independent bases upon which the board's decisions in this case should be vacated. You have in front of you a large record with a lot of pieces of paper but there are really five issues any one of which you could decide and on its own resolve the case without reaching any of the for you first what those are and then I'll talk about them in more detail. The first is the board's misinterpretation of the collective bargaining agreement. The second is the board's misapplication of the work preservation test when it comes to the scope of the bargaining unit. The third also concerns the misapplication or rather use of an incorrect work preservation test where the board adopted a acquisition versus preservation dichotomy that the Supreme Court has rejected. The fourth independent basis for rejecting the board's decisions is their failure to allow the union to present evidence of collusion and the fifth basis is the misapplication of race judicata. Let me begin by talking about the misinterpretation of the collective bargaining agreements is something that the law gives the federal courts the jurisdiction to decide in the first instance. This is not an area where the board's decisions are entitled to deference. It's your honors and the federal court who have the authority to decide the meaning of the agreement and in this agreement I refer your honors in particular to three provisions section 1.71, 72 and 73 which together cover the work in dispute. The work in dispute is the maintenance and repair and the electrical maintenance and repair of stevedore cargo handling equipment at Kinder Morgan's terminal in Vancouver Washington. These provisions of the agreement that I just identified for you cover quote the maintenance and repair of all present and forthcoming stevedore cargo handling equipment and in 1.73 all present and forthcoming technological equipment related to the operation of stevedore cargo handling equipment and its electronics and I'm quoting from 1.72 and 1.73. So this plain language covers maintenance and repair generally. It provides for no exception or limitation by trade or craft and the intent to cover electrical work in particular is shown in the reference to electronics in 1.73 which uses that word precisely. Now elsewhere in the agreement there are exceptions to the broad grant of jurisdiction in the provisions that I just recited for you. None of those exceptions applies to the work in dispute here and all parties are in agreement about that but what these exceptions show is that when the parties intended to carve out work from this broad grant of jurisdiction they did so expressly because none of those exceptions apply here. The work is covered under the language of 1.72, 1.73 and 1.71 more generally. In addition to that plain language you also have in front of you two arbitration decisions decided by the arbitrators charged with interpreting this agreement selected by the parties to interpret their agreement and in both of those decisions the arbitrators found that the work was covered. I refer your honors in particular to the decision of the coast or the appellate arbitrator which was respondents exhibit 32 in the unfair labor practice proceeding. That was decided before the 10k issued 10k decision issued in this case and a second decision even more precise as to Kinder Morgan's responsibility to assign the work to my client which is that ILWU excerpts of record 260. Finally with regard to the collective bargaining agreement you have in front of you and the NLRB had in front of it the undeniable position of the parties who negotiated this contract the International Longshore and Warehouse Union and the Pacific Maritime Association. Those are the parties who negotiated the agreement and they told the board and they are here today to tell you that their agreements that they must find that the board committed error in finding that the agreement did not cover the work. Ms. Morton may I ask you a procedural question you have five independent grounds as you characterize them and my question is if we were to find for you on one of these independent grounds is it your view that that means that the case gets remanded back to the board? Yes that is I think the appropriate result here. So let me let me just ask you for example although you have put it as a final point the res judicata which I guess I call flame preclusion or whether it was dispositive if we were to rule in your favor hypothetically on that point then is it your position the whole case would go back for remand so that the case would then be viewed through a different lens? That's correct your honor that is that is my view. The board in its decision in this case in section B of its decision in this case attempted to rest its claim preclusion as you say and the second was the board gave lip service to consideration of work preservation but the board's analysis in in section 2 part B of its decision consistently harkens back to this erroneous notion that the board had that its decision in the 10k case was preclusive so if your honors find that the board was wrong in its preclusion ruling which indeed you must find and the board doesn't really even attempt to defend that aspect of its ruling then then the entire case must be sent back to the board for de novo a new consideration of the ILWU's work preservation claim. Can I ask a question about the work preservation doctrine? Please. Does that doctrine encompass the right ability of one union to physically restrain a second union from coming to work? Your honor what that doctrine does is it allows parties and a union to engage in concerted protected lawful activity to protect the work of their members. Does it permit physical violence? No but it does. It's not my question my question is does can it or doesn't embrace the ability in this case of the longshoremen to physically prevent electrical workers from coming to work? It does your honor if that's concerted protected activity it's peaceful protest it protects that. So let me speak a little bit about the work preservation defense and the two legal errors independent legal errors that the board made here. The first concerns the board's of the scope of the bargaining unit. The board ignored the cases of this circuit particularly Maui trucking American president line and the Bermuda container cases from the Second Circuit finding that when in analyzing a work preservation claim you look at the bargaining unit as a whole when you were looking at the issue in a context of a multi-employer bargaining relationship as this one is. The board ignored this precedent without comment and that creates not only a legal problem but a real practical problem for the parties before you today. The parties the ILWU, PMA and PMA's member companies organized themselves and their relationship with each other based on the law as it acknowledging that they were doing that and upset the expectations of the industry. Affecting not only the parties in front of you but the parties on the East Coast as well. We have in front of you an amicus brief from the International Longshoremen's Association which represents dock workers on the East Coast of the United States and the Gulf Coast pointing out the error the legal errors of the board's analysis and the real practical problems for the board's discussion poses. And with that I'd like to reserve the rest of my time for rebuttal. Thank you, your honors. You may. Mr. Keneally. Morning, your honors and may it please the court. Michael Keneally on behalf of PMA. We agree with the ILWU but the board's ruling rests on several fundamental legal errors and I'd like to start if I may with the question Judge would the court really even need to address if it agrees that there are at least some errors here. We agree with the ILWU that any one of these grounds would be enough to warrant sending this case back to the board because it is hard to disentangle the various strains in the board's reasoning across the two decisions. It is however difficult to read the board's unfair labor practice ruling without getting the sense that the board was upset that the ALJ reconsidered the conclusions that the board had reached previously. But that is exactly what Supreme Court precedent and this court's precedent requires in an unfair labor practice proceeding. The 10k ruling is not supposed to be given preclusive effect. Now if the court. As a practical matter then let's just take your 10k ruling. If it's remanded on that and the unions and the board and IBEW disagree for example on the scope of the bargaining or how work preservation is defined. Would we then see the same ruling back up here on appeal or is there something that would change in the administrative proceeding as a result of say a singular ruling on 10k? Well I think you very well might see this case back up in front of you and your honors may be familiar with the local joint executive board case that's been ping-ponging back and forth between the board and this court for close to 20 years. And so I would encourage the. I don't know if I have 20 years. Well we wouldn't want to wish that on anyone. But I would encourage the court at least to address the contract interpretation part of this because that is kind of I think the fundamental point on which the 10k ruling rests. And this court's case in the 1974 ILWU decision I think suggests that if the contract interpretation is wrong we're kind of done. And here I think that ties together nicely with what the board concluded about the preclusive effect of the 10k ruling. Because one of the points that the ALJ emphasized and that the board rebuked the ALJ for emphasizing was PMA's position about the interpretation of the contract here. And I think it's unusual to say the least for the board to adopt an interpretation of an agreement that is rejected by both of the parties to that the parties selected to determine the meaning of their agreement. And I think that you know as Ms. Morton pointed out the courts and the arbitrators are the ones who have sort of primary authority in determining the meaning of a collective bargaining agreements. The board's labor law expertise does not normally encompass that sort of role for collective bargaining agreement interpretation. And so we would urge the court to take up that role here. And in its de novo review interpret the contract language of which there's not very much here. It's only a few provisions as Ms. Morton pointed out. The other issue. I have a quick question. Yes. Kit Morgan is a member of the association. That's correct. As such as such is bound by the agreement. That is correct. The Pacific Maritime Association is a collective bargaining agent of about 60 different employers across the West Coast. So the agreement here encompasses far more employers than just Kinder Morgan. But it is bound by the agreement. Well this focus in this case is upon a particular port and a particular work description. And Kinder Morgan is the operator of the right. That is correct. And one answer my question. You've answered my question. Thank you. Well the only thing I was going to say in addition your honor is that we think that one of the legal errors that is maybe most concerning in the grand scheme of things is the board's interpretation of the work preservation doctrine. By focusing just on whether the I.L.W.U. performed the same work for the same case law as well as the Court of Appeals decisions that we've cited. And unless the court has any other questions I see I'm over my time. We would urge that the court uphold these principles and set aside the board's decision. Thank you. We'll use the same procedure for you Ms. Beard and Ms. Jaffe to give you your own independent time. And would you be going first then Ms. Beard? Yes. You may proceed. OK. Good morning Heather Beard for the NLRB. OK. Before I respond to the specific issues that five specific issues that my opponents raised just now I want to take a step back and just highlight some of the things in this case that are not in dispute particularly with regard to the work preservation defense. OK. So first of all there is no dispute here that I.L.W.U. pursued grievances for work that did contravene the board's Section 10K decision as well as physically prevent I.B.E.W. members working for Accurate for coming to work for Kinder Morgan. And under well settled board law coercive actions by a union in contravention of a board's Section 10K award violate Section 8B.4.2.D. of the Act. There is also no dispute and this board considered both the Section 10K determination and the evidence there as well as the additional unfair labor practice hearing evidence regarding work preservation that came in. The board did not find. Ms. Beard may I ask a question please? So it doesn't look like you challenge the fact that there was a mistake in the finding of the 10K as being precedential. It doesn't seem in your briefs that you're challenging that. Do you challenge that? That there was race judicata properly determined? What I would say your honor is we did not say they are race judicata. However what the board found is that it would not permit the board's precedent says it doesn't permit re-litigation of issues in an 8B.4.2.D. hearing that are not elements of the 8B.4.2.D. actual violation. So that is the reason that you don't think that they violated the law by saying or improperly applied the law by saying that they couldn't consider that. Is that your reasoning? The reasoning is that the board and its precedent say for example with regard to two issues here, work preservation and collusion. With work preservation the board finds that is a defense, an affirmative defense to 8B.4.2.D. allegation. And because of that the board has said that that is not something that it will re-litigate in this unfair labor practice proceeding. However the board in the alternative in this case said we are going to allow the re-litigation of the work preservation doctrine in so far as we are going to allow in the evidence and legal argument and consider the evidence and legal argument. So for work preservation the section 10K determination was not functioning as race judicata in this particular decision. Excuse me. Do you concede that the 2008 agreement covers the work in question? No your honor. In fact that is the second point. You had me at no. No. The follow up question is do you dispute that within the collective bargaining agreement entered into in 2008 there was a built in dispute resolution process? There was however not for any parties other than the PMA and the ILWU and the other union involved here IBEW did not have access to that process which is one of the three threshold issues the board used to hold the 10K hearing. Go ahead finish. I'm sorry I'm finished your proceedings that some exception contained within the 2008 collective bargaining agreement carves out the work of Accurate Electric at the Vancouver port. No your honor. What our argument is is when you read section 1.71 which defines the work the scope of the work along with the section 10K determination also talks about the work in question which is licensed electrical work. When you read 1.71 and look at the term maintenance and repair work our opponents would have that be quite obviously a plain language argument that means it includes all types of maintenance and repair work. But in this particular industry that is ambiguous as to what M&R or maintenance and repair work is. And once the board is able to look beyond that language into the ambiguity and taking a look at things such as the bargaining history and the past practice it became clear to the board in both the 10K as well as in the unfair labor practice proceeding that electrical M&R work is not considered part of the general maintenance mechanical and repair work that had ever been performed regularly either on the coast or at Kinder Morgan at this particular terminal. And that's the key because when you read 1.72 and 1.73 the definition of traditional work to be preserved in the face of technological loss goes back to 1.71 which the board found was not work that was electrical maintenance and repair work. And so that is why the board made the proper determination with regard to that particular to the PCLCD to that contract. Why the board determined that ILWU did not have a claim contractually to that work based on the contract and the history surrounding that. So we maintain that the board properly in both the 10K proceeding as well as the later unfair labor practice determination considered all of the evidence and legal argument of the ILWU in making the right decision about the contract. Isn't the, I'm sorry, excuse me. Isn't the language of that work very detailed and even if it wasn't the same practice as in the past it was the chosen language of the parties at the time. It has very specific language regarding what property needs to be repaired, what property needs to be serviced. And so it may be broader than it had been in the past but the parties did use that language in their agreement, correct? Well, I'm not quite sure which language. Are you talking about 1.72, your honor? The definition of the work to be performed. You were saying that the board looked at the repairs and said it cannot all be electrical, for example, was their argument. Sure. The board did. It looked at the work and what MNR, maintenance and repair, means. And maintenance and repair encompass not just the work, the mechanical work that ILWU have been doing for years, but also it didn't encompass the electrical work based on what the history was and the interpretation of even the PMA at one point of what that language meant. Now when they bargained in 2008, that provision did not change from all of the years in which the electrical maintenance and repair work was being performed regularly by non-ILWU represented employees. And so with regard to the dichotomy between work preservation and work acquisition and ILA, which I think this contract also speaks to, I think what the board did in this decision is recognize that under any standard of work preservation, whether it's the standard of work preservation, there still is that dichotomy. The Supreme Court did not say that dichotomy can never be applied. But under all of the standards, whether ILWU had been performing the work at that particular port for Kinder Morgan, whether they had been performing it for various different PMA members up and down the coast, under any of those standards, either of those two standards, it was not work to be preserved because it was not work that ILWU regularly did. And then in addition, the board absolutely considered the ILA cases and explained that we do not here have the situation where a union is preserving along with an employer work that it may lose in the future to technology by saying it will get the functional equivalent of that work in its bargain. ILA, the board not overruled, tried to disagree with ILA. The board is saying the facts on the ground here are not a case of technological displacement or even if there was a threat that there would be, the board said specifically on page five of the decision in order that there needs to be a careful consideration of what work is going to be lost and a careful consideration of what work is going to be gained so it is basically functionally equivalent of the work that was done before. And this case is factually about very different, as the board found from the 10K and in the ULP hearing, very different work that was done at first, that very different electrical work that was done not by ILWU regularly, but by another trade union that was not done by ILWU and now they want to take work that they have proven in no way throughout the course of this proceeding with their defense, work preservation to prove, that the work is functionally equivalent of work that they will be losing. And without any of that, there's been none of the work preservation standards that have been set forth by the board, by appeals courts and by the Supreme Court that they've met on the board. So the board is not upsetting the apple cart with regard to labor relations on the East Coast, the West Coast. It's saying based on this particular bargain that was struck, ILWU was not entitled to electrical MNR work, either because it had performed it or either because it was going to loop work in such a way that would- I have a question. I have a question. Okay. Can you put meat on the bones for me? Can you tell me what is this new electrical work that is not covered by the original language? Can you, can you describe it for me? Sure. I guess that, right. That is for to go to someone else and not to them. Go ahead. Excuse me. That's okay. What I'm saying is I'm actually, I'm not quite sure given that the failure of proof was in this case, what exactly the new work that's going to be done that will be, you know, electronics or what types of robots or what types of other different kinds of technology are going to come in? Because unlike in ILA, when there had been the containerization and various other types of work that had been lost, that had been, that had come to fruition and had been displaced so we could do an analysis such that in that case, 20% of the work was needed to be taken. Here, we don't know and indeed I believe Mr. Marzano from the PMA's testimony was that future work that would happen beginning in 2014, 15 and 16 might be work on which there could be electrical work. However, at the time that these grievances were filed by ILWU and the time that they physically blocked members of IBE to come in and do the work, there's no showing that any of that technological displacement had taken place to put meat on the bones of a work preservation committee. Before you run out the clock, the ALJ had a seven day hearing in 2014, dismissed the board's complaint, concluded that the relevant case law recognizes agreements like the one in question and that the Longshoremen were serving a valid work preservation objective and that Kendra Morgan as part of the association was bound by it. The NLRB reversed five years later. What took so long? Your Honor, I'm not privy to all the machinations of the decision making process. However, I do know that when the board did look, not just at the ALJ, but did look, I think my opponent Mr. Kenally suggested the board was upset with the ALJ, which I would take issue with. The board simply disagreed as it is its purview with the ALJ when making inferences from the evidence and its expertise as the ULP hearing, this was not a case where ILWU made a valid or shouldered the burden of its work preservation. I was actually looking to see if there might be an innocent explanation that is that maybe during some period during this five year period that the board didn't have a working majority, didn't have a quorum. Is that possible? Well, there was quite a bit of litigation. If you don't know, just say so. Yeah, I guess that's a good point. I don't know. I think that there was some litigation over Noel Canning and new process about the board's quorum during this time. But I suppose I'd say that even if that wasn't the case, I would say an innocent explanation may have just been the board decision making process. But I take your point. There were, I am not aware of any quorum or board recess, presidential recess appointment decisions being, taking the time. But that could have been the case, your honor. And so in terms of the rest of the points that were made, I believe my- I think Judge McHugh has a question. I have a question for you. So your recent discussion seems to, well, first of all, it underscores that the parties appear to agree on nothing. But in particular, you hearken back to the 10K ruling on evidence and as a foundation for the work preservation scope. So it seems to me, even if, even if we agree with ILWU with respect to the scope of the agreement, that we'd be back into this whole dispute over what effect or what impact the 10K ruling has, wouldn't we? I mean, because that's your argument. Sure. If we, if the section 10K determination, for whatever reason, this court disagrees with the board in finding that the section 10K determination, again, with the standard of deferential review is not legitimate, then I do believe the case would need to be remanded back to the board in order for the board to consider its findings, particularly with regard to the section 8B42B violation, which is, which it would need to take a look at in light of, in light of that. So yes, we would agree, but we do believe that the section 10K determination was one that was found legitimate by the board. And in fact, that the board legitimately buttressed those findings by reviewing what occurred during the, during the unfair labor practice hearing. And I believe, I know I have 20 seconds left in IBEW, taking three minutes of my time. I would, I would yield unless you have any other questions before. It appears not. Thank you. Ms. Jaffee. You'll need to, you'll need to, you'll need to unmute. We can't hear you. We need you to unmute. I'm sorry about that. No, no problem. It happens all the time. So we'll start the clerk now. Thank you. Great. May it please the court. I'm Elizabeth Jaffee on behalf of Intervenor IBEW Local 48, which represents the journeyman electricians who have historically performed the disputed electrician work that's at issue here. And in my limited time, I want to follow up on some of the questions you had and underscore the evidence showing that the licensed electrician work at issue here is not the equivalent, not functional or otherwise, of any ILWU work that's historically been performed, including the mechanical maintenance and repair work. The petitioners attempt to gloss over the really categorical difference between licensed journeyman electrician work on the one hand and longshore mechanic work by claiming that this maintenance and repair language in the agreement, the collective bargaining agreement, includes what they call electrical maintenance and repair. But just using those words, electrical maintenance and repair, to refer to the two very distinct classes of work that have historically been performed by members of two completely separate trades doesn't render them functionally equivalent. The maintenance and repair work historically performed by ILWU represented employees is mechanical machine work. This is maintaining chassis, changing tires, replacing belts, welding, cleaning the machinery, et cetera. And the ILWU represented employees who have done that work historically have always been referred to as mechanics. And there's multiple documents in the record showing that they're mechanics. The electrical work that's at issue here has never traditionally been referred to as maintenance and repair or mechanic work. It's referred to in multiple documents as service electrician work and includes highly skilled electrician work like rewiring, checking speed switches, installing switches, addressing voltage spikes. There's no exhibit in the record, not the contract between Kinder Morgan and Accurate Electric, the electrical contractor, not job descriptions, not invoices, nothing that refers to the journeyman electrician work as maintenance and repair or mechanic work. Two totally different kinds of work. And ILWU has attempted to acquire that work by making it seem equivalent by simply calling the electrician work electrical maintenance and repair. And it's just not what the parties understood to be maintenance and repair work when they bargained that language, the maintenance and repair language, decades ago, originally in Section 1.71, which as Ms. Beard pointed out, is really the key to the interpretation here. If maintenance and repair work includes electrician work, then surely ILWU would have tried to claim that long before 2010. There's no evidence in the record that they ever tried to do that for 32 years until 2010. It's undisputed also, oh, I'm sorry, I see I'm over my time. No, no, finish your conclusion. I just wanted to say that it's undisputed that this work is licensed journeyman electrician work that must be, by law, be performed by a licensed electrical contractor. And there's record evidence showing that the state of and that work has been attempted to be acquired by ILWU workers for other Port of Vancouver employees that are PMA members. And so for all these reasons, we ask the court to enforce the board's award. Thank you very much. Thank you. We'll return now to Ms. Morton for rebuttal. Good morning again. Thank you, Your Honors. I want to begin by talking about identifying for Your Honors some of the arguments that we've heard here this morning from the NLRB and from counsel for IBEW that are not the basis for the board's decision in this case. It is black letter law that the decision rises or falls based on the analyses that the board actually did. And let me begin by some of the things that counsel for IBEW just pointed out. Arguments about electrical licensing, arguments about the supposed distinction between the traditional work of the ILWU and the traditional work of the electrical workers. That appears nowhere in the board's analysis. I will note that both of those issues were addressed by the administrative law judge, and he rejected the arguments that IBEW is making here today. I'd also like to talk a little bit about the ILA cases responding to some of the comments from Ms. Beard and some of your questions. The ILA cases here apply with full force as the administrative law judge found. The ILA cases apply when there is significant change in an industry that threatens jobs. My client was not obligated to show that anybody had their job yet. They were not obligated to wait until people were out of work to try to protect their jobs. What mattered was whether or not jobs are threatened. And that is really undisputed here. In 2008, the parties entered an agreement that allowed the Pacific Maritime Association and its member companies, including Kinder Morgan, if it chose or not, if it didn't, to automate longshore jobs out of existence. That's not something that would happen overnight. It requires significant time and effort and capital investment, but it was something that the 2008 agreement paved the way for, a cataclysmic change in this industry. And so what my client negotiated in response was the ability to expand and grow work that it had previously performed. Now, Ms. Beard says that it is relevant that my client had never done the electrical work before at Kinder Morgan. We dispute that that is a true statement as a factual matter, but assuming that it's true, that is not the analysis. And in fact, in the ILA cases, they address precisely this issue and precisely this argument that the NLRB made in those cases. The ILA in those cases had never done the disputed work before. The Supreme Court said that that is not determinative of whether or not they have a lawful work preservation objective. What matters is whether jobs are threatened and whether the work being sought is the same or the functional equivalent of work the workers have traditionally performed. And I refer your honors in particular to ILA-2 and ILA-2 Note 19, which addresses this test in some detail. Had the board conducted this analysis, they would have ruled in favor of my client as the administrative law judge did. But the board did not conduct this analysis at all. The board did not analyze in its decision whether the work that my client was seeking is quote the same or functional equivalent of work that they have done before. As ILA-1 says, and I'm quoting the Supreme Court, they say whether the union has done the work before is quote only the beginning of the analysis. For the board in this case, it was the beginning and the end. And that was clear legal error. If the board had done this correct test of analyzing whether the work was the same or the functional equivalent of work that the ILWU had done before, they would have concluded as the ALJ did, that my client had a valid work preservation claim. There is no dispute and the board concedes that the traditional work of the ILWU bargaining unit includes the maintenance and repair of Stevedore cargo handling equipment. There is also no dispute that ILWU longshore workers perform electrical maintenance and repair at multiple different locations. The board tries to minimize that record, but even under their minimal interpretation, there's no dispute that it is done. So under a proper legal analysis of same or functional equivalent of work preservation, given the cataclysmic threat to their jobs that longshore workers face given automation, my client has a valid work preservation claim. I want to end by just addressing one issue that I believe came up in one of your questions, Judge Kendall. Under the work preservation analysis from the ILA cases, the Supreme Court has not said that there must be a direct causal relationship between the technological change and the work being sought. That is not part of the test. And in fact, that was something that was discussed in the ILA cases and I refer your honors to ILA 2, page 70, which notes that that was an issue that the administrative law judge lit upon in that case. There wasn't a causal relationship between the work the ILA was seeking and the technological changes that were happening industry-wide. That argument was rejected. Thank you, your honors. I appreciate it. Thank you. Thank you to all counsel for your argument this morning. The case of ILA 2, LWU versus NLRB, et cetera, is now submitted and we'll hear argument next in Shorehampton Drive Trust versus JPMorgan Chase Bank. We have a number of cases submitted on the briefs and those are listed on the court's docket sheet. So I won't read those. Thank you to counsel from the previous case and we'll now proceed.
judges: Hawkins, McKeown, Kendall